UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | | |
|---|---|---|
| DARYL MURPHY | ) | 04C 3496 |
| Plaintiff, | ) ) | |
| | ) | JUDGE JOHN W DARRAH |
| v. | ) ) | |
| EDDIE MURPHY, EDDIE MURPHY | ) ) | MAGISTRATE JUDGE LEVIN |
| PRODUCTIONS, INC. a California corporation; | ) | Hon. |
| LARRY WILMORE, STEVE TOMPKINS; | ) | |
| RON HOWARD; TONY KRANTZ; BRIAN | ) | |
| GRAZER; TOM TURPIN; WILL VINTON; | ) | |
| WARREN BELL; WILL VINTON STUDIOS, | ) | |
| NC., an Oregon Corporation; IMAGINE TELEVI- | ) | |
| SION, a California general partnership; | ) | |
| TOUCHSTONE TELEVISION | ) | DOCKETED |
| PRODUCTIONS, LLC; FOX BROADCASTING | ) | MAY 2 0 2004 |
| COMPANY, INC., a Delaware Corporation; | ) | |
| WARNER BROS. TELEVISION, A DIVISION | ) | |
| OF TIME WARNER ENTERTAINMENT | ) | |
| COMPANY, L.P., Delaware Limited Partnership. | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT AND DAMAGES FOR COPYRIGHT INFRINGEMENT AND JURY DEMAND

NOW COMES PLAINTIFF, DARYL MURPHY, by his attorneys, Peter A. Cantwell

and Paul H. Scheuerlein, and for his Complaint against Defendants, EDDIE MURPHY,

EDDIE MURPHY PRODUCTIONS, INC. a California corporation; LARRY WILMORE,

STEVE TOMPKINS; RON HOWARD; TONY KRANTZ; BRIAN GRAZER; TOM

TURPIN; WILL VINTON; WARREN BELL; WILL VINTON STUDIOS, INC., an Oregon

Corporation; IMAGINE TELEVISION, a California general partnership; TOUCHSTONE

TELEVISION PRODUCTIONS, LLC; FOX BROADCASTING COMPANY, INC., a

Delaware corporation; and WARNER BROS. TELEVISION, A DIVISION OF TIME

1

WARNER COMPANY, L.P., a Delaware limited partnership, states as follows:

## Nature of the Case

1.     This case complains of blatant copyright infringements by Defendants, by their unauthorized use of MURPHY's videotape (the "Videotape"), subject matter of which was used for a television program called The PJs ("The PJs") which aired for almost two and one-half years in this district, first on a Fox channel, then on a Warner Brothers television channel. People filmed by MURPHY, are depicted on The PJs, a cartoon sit-com, that used a foamation process to make its characters. As alleged in this Complaint, there are striking similarities between people depicted on the Videotape as well as scenes, scenery and one frequently made statement on the Videotape.

## The Parties

2.     Plaintiff Daryl Murphy ("MURPHY") is a documentary film maker, operating his business, KEEP IT REAL MOVIE PRODUCTION, in Chicago, Illinois, more specifically, within and near the Chicago housing projects.

3.     MURPHY is and was at all times mentioned in this Complaint a resident of the City of Chicago, in the State of Illinois.

4.     Defendant Eddie Murphy ("EDDIE"), a creator and one of the executive producers, and the voice for the character Thurgood Stubbs, a janitor in the projects, depicted on the PJs, is a well-known entertainer, whose television shows, including the PJs, and movies are shown internationally, including on numerous television stations and movie screens in the state of Illinois, and in this district, and on information and belief EDDIE resides in Los Angeles, CA.

5.     MURPHY is informed and believes, and on that basis alleges, that Defendant

Eddie Murphy Productions, Inc. ("Murphy Productions") is a California corporation, and listed as the first production company in the credits for a television show called the PJs, which was aired in the state of Illinois, in Cook County, as well as throughout the United States, in Canada and in England for varying periods beginning in January, 1999.

6.     Defendant, Larry Wilmore, is one of the creators and one of the executive producers of the PJs, and on information and belief resides in California.

7.     Defendant, Steve Tompkins, is one of the creators and one of the executive producers of the PJs, and on information and belief resides in California.

8.      Defendant, Ron Howard, one of the executive producers of the PJs, is a well-known actor, and director, and on information and belief resides in Connecticut.

9.     Defendant, Tony Krantz, is one of the executive producers of the PJs, and, on information and belief resides in California.

10.     Defendant, Brian Grazer, one of the executive producers of the PJs is a writer and producer, and on information and belief resides in California.

11.     Defendant, Tom Turpin, one of the executive producers of the PJs, was at all pertinent times related to this Complaint president of Defendant, Will Vinton Studios, and on information and belief resides in California.

12.     Defendant, Will Vinton, one of the executive producers of the PJs, is chairman of Defendant, Will Vinton Studios, Inc. and on information and belief resides in Oregon.

13.     Defendant, Warren Bell, is one of the executive producers of the PJs, and on information and belief resides in California.

14.     Defendant, Will Vinton Studios, Inc., on information and belief, is an Oregon

3

corporation, with its principal place of business in Portland, Oregon.

15.     Defendant, Imagine Television, on information and belief, is a California general partnership, with its principal place of business in Los Angeles, CA.

16.     Defendant, Touchstone Television Productions, LLC, on information and belief is a Delaware limited liability company, whose sole member was ABC, Inc, incorporated in New York, with its principal place of business in New York.

17.     Defendant, Fox Broadcasting Company, Inc., on information and belief, is a Delaware Corporation, authorized as a foreign corporation to do business in Illinois, with its principal place of business in Los Angeles, CA.

18.     Defendant, Warner Brothers Television, a division of Time Warner Entertainment Company, L.P., on information and belief, is a Delaware limited partnership, with its principal place of business in New York.

## Jurisdiction

19.     Jurisdiction is proper under the Federal Copyright Act of 1976, as amended, 17 USC §§ 101 et seq. This Court has jurisdiction pursuant to Sections 1338(a) and 1338(b) of the Judicial Code (28 USC §§ 1338 (a), 1338(b)). Jurisdiction is also proper in this Court under Section 1332(a)(1) of the Judicial Code (28 USC §1332(a)(1) because the parties are diverse, MURPHY, being a resident of Illinois and all Defendants, being incorporated outside Illinois, if corporations, or resident outside Illinois if individuals, and the amount in controversy exceeds $75,000 without costs and attorney's fees.

## Venue

20.     Venue in this district is based on Section 1391 of the Judicial Code (28 USC §1391) and Section 1400(a) of the Judicial Code (28 USC §1400(a) because Defendants

4

have collectively had significant involvement with the creation, production and broadcast of the The PJs, which began to be broadcast in the state of Illinois, on the Fox Channel 32, in the district in which this Court is located, in the second week of January, 1999 and had been broadcast on almost a weekly basis through May, 2001. Venue is also based on Section 1391 because at least one named defendant maintains a registered agent in this district, and is subject to personal jurisdiction in this district. Venue is also proper in this district because MURPHY'S injuries occurred in this district.

## Background

21.    MURPHY was raised in, and lived in the Robert Taylor Homes, for the first 20 years of his life. The Robert Taylor Homes is also known as one of the buildings in the Chicago Housing Authority projects.

22.    Beginning in mid-1997, MURPHY took video pictures of many subjects in the projects; frequently, representing himself and referring to himself on his videotapes, as "Daryl Murphy, Keep It Real Movie Production."

23.    MURPHY would frequently walk through the projects on the Southside of Chicago, specifically, Robert Taylor Homes, Stateway Gardens and the Ida B. Wells Apartments with a video camera, and filmed life in the projects as he saw it, through his trained eye as a videographer, as well as through the eyes of a person who experienced that life.

24.    Many subjects were covered in his films, including, interviews with individuals who lived, or once lived in the projects; scenery; buildings; signs; traffic intersections, and personal home scenes.

25.    MURPHY also filmed family gatherings at his late mother's bungalow-style

home, a residence she moved to after she left the projects.

26. In 1997, MURPHY began to film specific individuals including a man who uses a voice box to speak, named Tally Collier, a heavy set child, with a chubby face, named Derrick Pittman, a skinny middle-aged man, named Lester Jackson, a middle-aged lady named Theoada Griffin, a middle-aged man named Walter Hale, as well as certain of his relatives, including his late mother Katie Murphy Foster.

27. MURPHY painstakingly worked on the Videotape for many months, choosing the subjects, the time of day, the location, filming and interviewing the subjects, the majority of whom were filmed in the Chicago Housing Projects, controlling all of the videotaping, deciding on the final product, and completing the Videotape by the very early months of 1998.

28. The Videotape itself, as one work, is material able to be copyrighted.

29. Murphy has applied for registration of copyright for one of the Videotape which shows the aforesaid mentioned individuals and scenery.

30. MURPHY is and has always been the sole owner, and claims the entire right, title and interest in the Videotape and the copyright in and to all material which appears on the Videotape.

31. In and about early 1998, and from time to time, MURPHY alleges that, Oprah Winfrey, an internationally known celebrity talk-show host, had made requests for ideas for shows. Since MURPHY lived in the Chicago Housing Association projects for 20 years and continued to film there, and, since Murphy suspected that the projects would be torn down someday, knowing when the teardown began, all the history and experiences, both positive and negative would die with the wrecking ball, he decided to propose to Oprah Winfrey in a

letter attached hereto as Exhibit A, and incorporated by this reference, an idea for a show, based on the Videotape.

32.     MURPHY did all the work to produce the Videotape, composed the material, and conducted the interviews, and is the copyright owner of all the material on the Videotape, and claims ownership to any derivations, modifications or other uses of the Videotape or parts thereof.

33.     MURPHY gave no individual or entity permission to do anything with the Videotape, except as stated in Exhibit A.

34.     MURPHY gave no individual or entity approval to use the Videotape for purposes of profit, or in any commercial sense or for any commercial venture.

35.     On or about April 18, 1998, after completing the filming for the Videotape, MURPHY composed Exhibit A.

36.     Within a very short period of time after MURPHY wrote Exhibit A, MURPHY mailed by certified mail, return receipt requested, the Videotape, a business card, and Exhibit A, directly to Oprah Winfrey at Harpo Productions, in Chicago, IL.  Shortly thereafter, MURPHY received the green card confirming receipt of the package.

37.     After mailing the Videotape, and receiving confirmation, MURPHY did not hear anything from Oprah Winfrey, or any of the other individuals specifically mentioned in his letter, to whom he asked Oprah Winfrey to pass on the Videotape; Spike Lee, Tom Hanks, Quincy Jones, Ron Howard or Fred Williamson.

38.     Since the date MURPHY mailed the Videotape, he never heard anything from Oprah Winfrey, any representative connected with her organization, or any of the other individuals mentioned in Exhibit A.

39.     Approximately nine months later, a new television program  appeared on Fox Channel 32, and aired in Chicago.  On information and belief, it is alleged the new program aired in all major and many minor television markets throughout the United States. The name of the show was The PJs, created by EDDIE and Larry Wilmore and Steve Tompkins. Ron Howard and Brian Grazer were executive producers.  Quincy Jones was also involved. The credits list EDDIE as the creator, thereafter the other names follow.

40.     Ron Howard and Quincy Jones are both names which appear in Exhibit A.

41.     EDDIE and Ron Howard have previously worked together on entertainment projects, the movies "Boomerang", "The Nutty Professor", "The Nutty Professor II" and "The Klumps."

42.     It is undisputed that EDDIE and Ron Howard worked together on the PJs.

43.     The PJs, set as a cartoon in an urban housing project fictitiously named Hilton-Jacobs, was intended as a sit-com to show life in the projects.  It won two or more Emmy awards. In particular, it won an Emmy Award for the voice of the character of Mrs. Avery (Janet DuBois). It was also nominated for other Emmy Awards for Outstanding Animated Program, for the episode "He's Gotta Have It"; and for Outstanding Main Title Theme Music.

44.     Based on the date and content of Exhibit A, and the timing of the airing of the PJs, MURPHY believes that the Videotape was passed to one or more of the persons listed in Exhibit A, thereby providing access to either the creators of the PJs, or to one or more executive producers.

45.     As shown below, the number of coincidences between the material on the Videotape, and the actual television show, the PJs are far too numerous and in some instance,

personal, to be mere coincidence, and on that basis, MURPHY alleges that the numerous

coincidences occurred because the material on the Videotape was viewed and used, all of

which was without MURPHY's approval.

46.     MURPHY is informed and believes, and on that basis alleges that EDDIE and

the other defendants involved in the creation and production of the show, had notice as to

whose Videotape it was, how it was obtained, and how MURPHY, the Videotape maker

could be contacted.  Throughout his filming of the Videotape, MURPHY states this is Daryl

Murphy, Keep It Real Movie Production, and provided his card with the letter sent to Oprah.

The card included his telephone number.

47.     EDDIE and the other defendants involved in the creation and production of

the PJs,  once received, possessed and took control of the Videotape; used portions to their

benefit, in helping to create, and/or assisting in the production of the PJs television program;

and improperly and deceptively realized profits, gains and advantages, all without notifying,

giving credit to, acknowledging, or obtaining permission from MURPHY.

48.     MURPHY is informed and believes, and on that basis alleges the defendants

who purchased the PJs, or entered into one or more contracts with EDDIE and the other

defendants involved in the creation and production of the show, have also realized profits,

gains and advantages, based on the airing and advertising of the PJs, all of which come from

an unauthorized derivative work made from the Videotape.

49.     MURPHY is informed and believes, and on that basis alleges that EDDIE, as

the PJs creator and one or more other defendants knowingly used material and information

from the Videotape he knew was not his original creation, such as, but not limited to, footage

specifically depicting people which were recast as foamation characters, scenery, shots of

9

Chicago Housing Authority buildings, and facts from lives of certain people filmed on the Videotape, which EDDIE and the other defendants involved in the creation and production of the show could not have known, imagined or thought up independently.

50.     MURPHY is informed and believes, and on that basis alleges EDDIE was previously involved at least once, in unsuccessful litigation based on the use of another's material, where there were alleged coincidences related to the movie "Coming to America" and the treatment by Art Buchwald titled, "King For A Day."

51.     To MURPHY'S amazement, The PJs not only used parts of the scenic footage MURPHY included in the Videotape, but also used the identifiable likeness of no less than three or more individuals from the Videotape, as the models for the foamation characters; used facts from at least one or more character's lives, which could not been known; and used or paraphrased direct verbal remarks, also stated or implied on the Videotape.

52.     MURPHY never gave verbal or written permission for his copyrighted work to be used in any medium, for any purpose, by anyone, or any entity other than to be shown on the Oprah Winfrey show. To the best of MURPHY's knowledge, the Videotape was not shown on the Oprah Winfrey Show.

53.     Since the likenesses and scenery is so identifiable, as to tie them to persons, living, or frequenting the Chicago Housing Authority projects where MURPHY filmed, MURPHY has been stopped by many people in the Chicago Housing Authority projects, because of the belief that he is a part of, or involved with the PJs, and has profited from that program.

54.     MURPHY has been accused of selling out his neighborhood, since he has not returned to the community any of the money his neighbors, believe he has earned from the

10

PJs, or any other revenue streams which might have resulted from the television program, none of which have, in actuality, been received by MURPHY.

55.     MURPHY has assured these people that he has not received anything. MURPHY insists that he found out about the PJs the same way they did, by watching it on television.

56.     Tally Collier's identifiable likeness, seen and then taken directly from the Videotape, and Tally Collier's gestures and voice were the basis for and closely resemble the character Sanchez.  Both the individual in real life (Tally Collier) and the character on the PJs (Sanchez) are African-American, use a voice box to speak (a rare occurrence in society as a whole, let alone an African-American male from a housing project), have similar head-neck placement, have similar dark eyebrows, have jowled cheeks, although Sanchez's are exaggerated,  have a similar nose, have a chin which ends in an elongated rectangular shape, with Sanchez being the only main character on the PJs with that characteristic; and are similarly built. Additionally,  Tally Collier's wife is deceased. The PJs character Sanchez's wife is also deceased, a particularly strange coincidence, given the identifiable likeness and the voice box.

57.     MURPHY believes none of the other characters have or talk about a deceased wife on the PJs.  The odds that EDDIE or any of the writers on the PJs could come up with a character who uses a voice box to speak, looks strikingly like a person who appeared and was interviewed on the Videotape, has similar gestures, and laments about his dead wife, are practically astronomical, if not impossible. The only way EDDIE and those other defendants involved with the PJs could have created Sanchez, is to have viewed Tally Collier on the Videotape.

58.     The PJs characters were made with big heads and small bodies. If the proportions were to scale, Sanchez would further resemble Tally Collier.

59.     MURPHY also filmed others in the Videotape who resemble characters on the PJs, such as Derek Pittman for the character Juicy and Katie Murphy Foster for the character Mrs. Avery.

60.     After watching the PJs numerous times, MURPHY also believes, and on that basis alleges that there are other characters that were modeled after the individuals in the Videotape.

61.     MURPHY has seen, during various parts of the PJs program, either at the beginning, after a commercial break, or at the end, depending on the episode, depictions he believes, and on that basis alleges are buildings which come directly from the Videotape. They are pictures of buildings which most closely resemble the Robert Taylor Homes as they appear on the Videotape.

62.     MURPHY believes, has heard while watching the PJs, and on that basis alleges, that certain remarks made on the PJs program came directly from, or the idea was taken directly from the material on his Videotape, such as the character Muriel stating she is a documentary film producer, MURPHY's very occupation.

63.     Many of the people MURPHY filmed and has known for years in the Chicago Housing Authority projects, have told him that they don't understand how he, MURPHY cannot be involved, since the people they know, and live with, have been made into cartoon characters and were some of the stars on the PJs (Sanchez, Juicy, Mrs. Avery to name a few).

64.     These could not all be total coincidences. The only way this could have

happened is if Defendant, EDDIE, and one or more of the other named Defendants involved in the creation, writing and production of the television program viewed and used material from the Videotape.

## COUNT I

## DECLARATORY JUDGMENT

65.     MURPHY realleges each and every allegation set forth in Paragraphs 1 through 64 inclusive, and incorporates them herein by this reference.

66.     Count I arises under the copyright laws of the United States 17 USC § 101 et seq.

67.     An actual controversy has arisen and currently exists between MURPHY and Defendants since MURPHY contends and defendants deny that defendants infringed MURPHY's copyright in the Videotape and made use of his filming, the subjects, statements, scenes and scenery for the The PJs; and MURPHY desires a judicial determination of this issue.

68.     It is necessary and appropriate to have this type of a declaration made at this time in order that MURPHY may ascertain his rights to compensation and credit for his contribution to The PJs.

69.     Pursuant to USC § 2201, MURPHY requests this Court to issue a decree declaring that the PJs could not have been made with the characters and scenery used in it, without the defendants first viewing the Videotape, in particular with reference to the character Sanchez, MURPHY alleges shares more than eight characteristics with Tally Collier, including the use of a hand-held voice box.

70.     Certain identifiable characters, depiction of buildings and neighborhood scenes, and verbal utterances, depicted, shown and made on and during the television

program The PJs can all be traced to material on the Videotape.

WHEREFORE, Plaintiff, DARYL MURPHY prays for judgment in his favor and against all named defendants, set forth, as follows:

1) That the Court issues a declaration that The PJs television program resulted in whole or in part from the Videotape created by MURPHY.

2) Reasonable attorney's fees and costs of this action.

3) All further relief this Court deems just and proper under the circumstances.

## COUNT II

## COPYRIGHT INFRINGEMENT

71.     MURPHY realleges each and every allegation set forth in Paragraphs 1 through 64 inclusive, and incorporates them herein by this reference.

72.     MURPHY was not consulted, nor did he give written or verbal permission to any person or entity to commercially exploit his copyrighted work, or any portion of his copyrighted work.

73.     Without contacting MURPHY, without notifying MURPHY, and without giving credit to MURPHY for any portion of the television program, The PJs, for use of the material on the Videotape, Defendants created, developed, produced, marketed, broadcasted thousands of times, and in one form or another profited from the popular, Emmy Award winning television program, the PJs, from January, 1999 through the 2001 television season.

74.     MURPHY's copyright was infringed each time the show aired, and if The PJs goes into syndication, at any time in the future, or if the show is being shown anywhere at the time this complaint is filed, MURPHY's copyright was and will be infringed each time the

The PJs is aired; each time it was and is advertised; each time a web-site was and is accessed, related to the official or unofficial information available at the web-site; each time a licensed product derived from the characters if any, was and is sold.

75.    Defendants have infringed MURPHY's copyright thousands of times, each representing an individual infringement, between January, 1999 and the filing date of this Complaint, with the potential for numerous future copyright infringements, each time any of the above occurs.

76.    On information and belief, one or more, if not all the named defendants profited, received advantages and gains, and/or will continue to profit, receive advantages and gains from their or its individual or collective involvement with and relationship to the television program, The PJs, directly and/or indirectly, as follows:

1) Direct payments for creation of the program.

2) Direct payments, with the potential for royalties from advertising revenue, or other forms of revenue for sale of the program to one or more networks, or broadcasting companies, for broadcast purposes.

3) Direct payments for licensing products if any derived from the characters.

4) Direct payments from the sale of television advertising time.

5) Direct payments for future syndication if any, and/or the sale of any and all rights to re-run all or a portion of the episodes.

6) Indirect payments, and gains, in the form of increased exposure, and advertising, each time an official web-site (for ex. WB-PJs web-site), or an unofficial web-site was or is accessed, and pictures of the PJs characters, or information about the PJs was or is provided.

7) Indirect payments, and gains, leading to greater revenues after the program won each Emmy Award.

8) MURPHY is entitled to all or a significant portion of Defendants' profits, gains and advantages, resulting from this unauthorized use of the Videotape.

WHEREFORE, Plaintiff, DARYL MURPHY prays for judgment in his favor and against all named Defendants, set forth, as follows:

1) That this Court finds that defendants have infringed MURPHY's copyright in the Videotape.

2) Actual damages in an amount to be determined after a trial on the merits;

3) All profits attributable to infringement of MURPHY's copyright in accordance with proof.

4) Punitive and exemplary damages in the amount of $10,000,000.

5) Any accounting by defendants for all gain and/or profits and advantages derived from their acts of infringement.

6) That all gains and/or profits and advantages derived by defendants from acts of infringement be deemed to be held in constructive trust for MURPHY's benefit.

7) Reasonable attorney's fees, and all costs of this action.

8) All further relief this Court deems just and proper under the circumstances.

## COUNT III

## FEDERAL UNFAIR COMPETITION

78.     MURPHY realleges each and every allegation set forth in  Paragraphs 1 through 64 and 71 through 77, inclusive,  and incorporates them herein by this reference.

79.     By their extensive use of the subject matter on the Videotape, by failing to

provide notice to MURPHY, and obtain MURPHY's approval, Defendants have engaged in, and are continuing to engage in acts of wrongful deception of the viewing public, wrongful designation as to the creation of The PJs program, wrongful withholding of MURPHY's right to public recognition and the right to credit as videographer, and Videotape producer and director.

80.     MURPHY's action concerning Defendants' unfair competition is related to, but, a separate cause of action, from MURPHY's "substantial" copyright infringement actions, since both causes of action are based on the same operative facts.

81.     After the PJs program first aired in January, 1999, and continuously after that date, Defendants collectively wrote, created and produced new episodes, marketed and broadcast the show, reaped profits from all those activities, as well as advertising, all without MURPHY's approval for the use of his material on the Videotape, or acknowledging MURPHY's role.  This conduct constitutes unfair trade practices and unfair competition under the Lanham Act.

82.     Further, Defendants claim a copyright in and to The PJs television program, without acknowledging the input the Videotape has had in the process of creating the copyrighted television program.  Since the copyright is based in part on MURPHY's work, who, himself, claims the copyright to the Videotape, from which many of the characters were derived, street and building scenes were taken, and verbal comments were borrowed, the copyright contains false and misleading statements of contribution to development of the PJs program, and constitutes additional acts of unfair trade practices and unfair competition, all of which have deprived and damaged MURPHY, and have produced profits, gains and advantages for defendants.

WHEREFORE, Plaintiff, DARYL MURPHY prays for judgment in his favor and against all named defendants, set forth, as follows:

1) Damages in an amount to be determined after a trail on the merits for unfair and deceptive trade practices;

2) Punitive and exemplary damages in the amount of $10,000,000.

3) An accounting to determine all gains, profits and advantages derived by Defendants as a result of their unfair trade practices and unfair competition;

4) Reasonable attorney's fees, and all costs of this action.

5) All further relief this Court deems just and proper under the circumstances.

Plaintiff Daryl Murphy hereby demands trial by jury on all issues triable to the jury.

Respectfully submitted,

DARYL MURPHY

By: _____
One of his attorneys

Peter A. Cantwell
Paul H. Scheuerlein
CANTWELL & CANTWELL
30 North LaSalle Street, Suite 2850
Chicago, IL 60602
312-372-3000
Attorney No. 91775

# EXHIBIT A

April 8, 1998

Dear Oprah:

My Name is Daryl Murphy of
Keep It Real movie Production.

Im writing this letter to you to give
you a show idea.
Best Community film festival.

I am a documentary film producer in
the public Housing on State Street that
great street.

you see there is so much History in
the projects on State Street, as well
as hidden Talent.

Ive lived in the Robert Taylor Homes for
22 years that a lot of generation. Ive seen
and so much laughter that it should
documented for History.

Some way Im going to ture down Robert Taylor
Ida B. will also State Cranes project.

I thought it would be a great idea to
film History.

My. Brother Lee Roy Murphy is the only Boxer from Chicago to go to the Olymic in the year of 1980.

He a gold medal winner, when he won the gold he did not get any national exposser so I thought it would be a great idea to film life and time of the gold on State street.

I inclosing a video tape of life and time of the project on State street federal I will also bla B will across King dr.

Hope, maybe you would show my film on your show, and pass it on to Spike Lee, Tom Hanks Quincy Jones, Ron Howard, Fred Williamson

Look forward to her from you.

Keep It Real

Production

By

D. Murphy

Phone 773 · 821 · 0383

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet  

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

JUDGE JOHN W. DARRAH

MAGISTRATE JUDGE LEVIN

**DOCKETED**

MAY 2 0 2004

**Plaintiff(s): Daryl Murphy**

**Defendant(s):EDDIE MURPHY, EDDIE MURPHY PRODUCTIONS, INC. a California corporation; LARRY WILMORE, STEVE TOMPKINS; RON HOWARD; TONY KRANTZ; BRIAN GRAZER; TOM TURPIN; WILL VINTON; WARREN BELL; WILL VINTON STUDIOS, NC., an Oregon Corporation; IMAGINE TELEVISION, a California general partnership;TOUCHSTONE TELEVISION PRODUCTIONS, LLC; FOX BROADCASTING COMPANY, INC., a Delaware Corporation; WARNER BROS. TELEVISION, A DIVISION OF TIME WARNER ENTERTAINMENT COMPANY, L.P., Delaware Limited Partnership.**

| | |
|---|---|
| County of Residence: Cook | County of Residence: |
| Plaintiff's Atty: Peter A. Cantwell, Paul H. Scheuerlein<br>CANTWELL & CANTWELL<br>30 N. LaSalle St., Ste 2850,<br>Chicago, IL 60602<br>312-372-3000 | Defendant's Atty:<br><br>Mark Blocker<br>Sidley Austin<br>10 S. Dearborn St., Chicago,<br>IL 60603<br>312-853-7000 |

II. Basis of Jurisdiction:          **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal
Parties (Diversity Cases Only)
Plaintiff:- **1 Citizen of This State**
Defendant:- **5 Non IL corp and Principal place of Business outside IL**

IV. Origin :                          **1. Original Proceeding**

V. Nature of Suit:                     **820 Copyrights**

VI.Cause of Action:                    **17 USC 101 et seq Copyright infringement based on the unauthorized use and exploitation of a Videotape made in Chicago to create or assist in the making of a popular television program**

Civil Cover Sheet                                                        Page 2 of 2

**called the PJs.**

VII. Requested in Complaint

        Class Action: **No**

        Dollar Demand: **monetary damages and declaratory relief**

        Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature: _____

Date: _____

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**             Revised: 06/28/00

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**DOCKETED**
MAY 2 0 2004

In the Matter of

Daryl Murphy, Plaintiff
v.
Eddie Murphy, et al., Defendants



Case Number **04C 3496**

JUDGE JOHN W. DARRAH

## APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Daryl Murphy, Plaintiff

FILED FOR DOCKETING
04 MAY 19 PH 1: 46
U.S. DISTRICT CLERK COURT
FD-7

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME  Peter A. Cantwell | NAME  Paul H. Scheuerlein |
| FIRM  CANTWELL & CANTWELL | FIRM  CANTWELL & CANTWELL |
| STREET ADDRESS  30 N. LaSalle St., Ste 2850 | STREET ADDRESS  30 N. LaSalle St., Ste.2850 |
| CITY/STATE/ZIP  Chicago, Illinois 60602 | CITY/STATE/ZIP  Chicago, Illinois 60602 |
| TELEPHONE NUMBER 312-372-300  FAX NUMBER 312-346-8300 | TELEPHONE NUMBER 312-372-3000  FAX NUMBER 312-346-8300 |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)  0383139 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)  6188425 |
| MEMBER OF TRIAL BAR?  YES ☑  NO ☐ | MEMBER OF TRIAL BAR?  YES ☑  NO ☐ |
| TRIAL ATTORNEY?  YES ☑  NO ☐ | TRIAL ATTORNEY?  YES ☑  NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER  FAX NUMBER | TELEPHONE NUMBER  FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?  YES ☐  NO ☐ | MEMBER OF TRIAL BAR?  YES ☐  NO ☐ |
| TRIAL ATTORNEY?  YES ☐  NO ☐ | TRIAL ATTORNEY?  YES ☐  NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☐ | DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☐ |