UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DARYL MURPHY,

    Plaintiff,

v.

EDDIE MURPHY; EDDIE MURPHY
PRODUCTIONS, INC., a California corporation;
LARRY WILMORE; STEVE TOMPKINS;
RON HOWARD; TONY KRANTZ; BRIAN GRAZER;
TOM TURPIN; WILL VINTON; WARREN BELL;
WILL VINTON STUDIOS, INC., an Oregon
corporation; IMAGINE TELEVISION, a California
general partnership; TOUCHSTONE TELEVISION
PRODUCTIONS, LLC; FOX BROADCASTING
COMPANY, INC., a Delaware corporation; and
WARNER BROS. TELEVISION, A DIVISION OF
TIME WARNER ENTERTAINMENT
COMPANY, L.P., a Delaware limited partnership,

    Defendants.

No. 04 C 3496

Judge John W. Darrah

## MEMORANDUM OPINION AND ORDER

Plaintiff, Daryl Murphy ("Plaintiff"), filed suit against Defendants under the Copyright Act, 17 U.S.C. § 101, *et seq.*[1] Presently pending before the Court is: Eddie Murphy Productions, Inc.; Will Vinton Studios, Inc.; Touchstone Television Productions, LLC; Fox Broadcasting Company, Inc.; and Time Warner Entertainment Company, L.P.'s (hereinafter "Defendants") Motion for Summary Judgment.

---

[1] Plaintiff's Complaint also sought declaratory judgment (Count I) and alleged federal unfair competition (Count III). In his response to Defendants' Motion to Dismiss, Plaintiff voluntarily withdrew Counts I and III; and those counts were dismissed. Thus, currently pending before the Court is only Count II of Plaintiff's Complaint, which alleges copyright infringement.

## UNDISPUTED FACTS[2]

Plaintiff was raised in the Robert Taylor Homes, a building in the Chicago Housing Authority Projects. Beginning in mid-1997, Plaintiff, a documentary film maker and owner of Keep It Real Movie Production, decided to videotape the lives of individuals in the projects, specifically those in the Robert Taylor Homes, Stateway Gardens, and the Ida B. Wells Apartments. Plaintiff filmed individuals who lived or once lived in the projects, scenery, buildings, signs, traffic intersections, personal home scenes, and family gatherings at his late mother's home. Furthermore, Plaintiff filmed specific individuals – including Tally Collier, a man who used a voice box to speak; Derrick Pittman; Lester Jackson; Theoada Griffin; Walter Hale; and Kate Murphy Foster, the late mother of Plaintiff. During all of his filming, Plaintiff also made references to himself and referred to himself as "Daryl Murphy, Keep It Real Movie Production."

After Plaintiff finished the documentary video, he applied for the registration of a copyright. On or about April 18, 1998, Plaintiff sent a letter with a copy of the documentary video to Oprah Winfrey at Harpo Productions in Chicago. In the last sentence of the letter, Plaintiff wrote, "Hope maybe you would show my film on your show, and pass it on to Spike Lee, Tom Hanks, Quincy Jones, Ron Howard, Fred Williamson." None of these individuals contacted Plaintiff. The videotape was never shown publicly, either on Oprah's show or anywhere else; and Plaintiff was never contacted by anyone with Ms. Winfrey's organization. Plaintiff never gave verbal or written permission for his work to be used in any medium, for any

---

[2] A review of the record reveals that several facts disputed by Plaintiff are, in fact, supported by the record; and there is no evidence to the contrary. To the extent that Plaintiff improperly disputed facts, they have been considered by the Court.

2

purpose, by anyone, or any entity. Plaintiff asserts he sent the materials by certified mail, return receipt requested, and that he later received the green card confirming receipt of his package, although, during the course of discovery, Plaintiff never produced the green card or a copy thereof evidencing the receipt of the video. A Harpo employee testified that Harpo Productions research department did not have a record of receiving the video tape. At the time Plaintiff asserts he sent the videotape, Harpo Productions received roughly 10,000 letters and 3,000 emails each week. Harpo's policy prohibits employees from forwarding submissions received from third parties to people not affiliated with the Oprah Winfrey Show. If anyone violated Harpo's policy of not forwarding submissions to third-parties, they would have committed a terminable offense.

Approximately nine months after Plaintiff allegedly sent Oprah the video, a new television program called "The PJs" began to air. "The PJs" aired from January of 1999 through the 2001 television season on Fox, Channel 32 in Chicago, Illinois. "The PJs" was a cartoon, set in an urban housing project. "The PJs" was created by Eddie Murphy, Larry Wilmore, and Steve Tompkins. In addition, Quincy Jones was involved in the creation of "The PJs". Eddie Murphy, Larry Wilmore, Steve Tompkins, Ron Howard and Brian Grazer were all executive producers. Based on its success, "The PJs" received two or more Emmy Awards and was nominated for other Emmy Awards, including Outstanding Animated Program, Outstanding Main Title Theme Music, and recognition for the episode "He's Gotta Have It."

The production of the show, which aired in 1999, began much earlier. During the summer and fall of 1997, working on an idea suggested by actor and comedian Eddie Murphy, Wilmore and others created characters, plots, scripts, and a presentation tape to help sell the

3

show to the Fox television network. By December 1997, Wilmore and Tompkins, the show's other writer, had created a "Writers' First Draft" of a script with descriptions of some of the characters and suggested dialogue.

## LEGAL STANDARD

Summary judgment is appropriate under Rule 56 (c) when no genuine issue of material fact exists or when, drawing all factual inferences in favor of the nonmoving party, no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992).

To establish copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Copyright extends to "original works of authorship." 17 U.S.C. § 102(a). However, there can be no copyright in facts. *Fiest*, 499 U.S. at 356 (emphasizing that § 102(b) of the Copyright Act of 1976 is "universally understood to prohibit any copyright in facts"). "[A]ll facts - scientific, historical, biographical, and news of the day . . . may not be copyrighted and are part of the public domain available to every person." *Fiest*, 499 U.S. at 348. A compilation of facts, on the other hand, "is not copyrightable *per se*, but is copyrightable only if its facts have been 'selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.'" *Fiest*, 499 U.S. at 356 (quoting the definition of compilation in § 101 of the 1976 Copyright Act). However,

4

"[e]ven a compilation that is copyrightable receives only limited protection, for the copyright does not extend to facts contained in the compilation." *Fiest*, 499 U.S. at 359 (emphasizing that §103 of the 1976 Copyright Act makes clear that the "facts contained in existing works may be freely copied because copyright protects only the elements that owe their origin to the compiler - the selection, coordination, and arrangement of facts").

Proof of copying constituent elements of the work that are original may be established by direct evidence (e.g., an admission) or inferred through indirect evidence. Copying may be inferred where: (1) the defendant had access to the copyrighted work and (2) and the accused work is substantially similar to the copyrighted work. *Incredible Technologies, Inc. v. Virtual Technologies, Inc*, 400 F.3d 1007, 1011 (7th Cir. 2005).

"Proof of access can be established by demonstrating that the creators of the allegedly infringing works had the opportunity to view the protected item." *Gentieu v. Tony Stone Images*, 255 F. Supp. 2d 838, 847 (N. D. Ill. 2003) (*Gentieu*). "If, however, the plaintiff does not have direct evidence of access, then an inference of access may still be established circumstantially by proof of similarity which is so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded." *Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir. 1984) (*Selle*).

The test for substantial similarity is "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work," *Warner Brothers, Inc. v. ABC*, 654 F.2d 204, 2-8 (2d Cir. 1981), *i.e.*, where the "copying, if proven, went so far as to constitute an improper appropriation." *Atari v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 614 (7th Cir. 1982), *overruled on other grounds by Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423 (7th Cir.1985).

## DECISION

Here, Defendants concede that Plaintiff holds a valid copyright but assert that Defendants did not copy the constituent elements of the Plaintiff's work. Defendants prosecute their motion on four grounds: (1) that Plaintiff cannot make a showing that his video and "The PJs" are "substantially similar"; (2) that any superficial similarities between Plaintiff's video concern non-protectable elements of his work; (3) that there is no evidence that Defendants ever had access to Plaintiff's videotape; and (4) that the concept and characters for "The PJs" were conceived and created before Plaintiff claims to have sent his videotape to Oprah.

*Substantial Similarity and Non-Protectable Elements*

According to Plaintiff, the similarities between his documentary and "The PJs" are far too numerous to be mere coincidence. For instance, Plaintiff alleges that the scenic footage from his documentary was used in "The PJs". In addition, Plaintiff alleges that there were three or more individuals from his documentary used as models for characters in "The PJs". Plaintiff alleges that the facts from the lives of certain people filmed in his documentary were so similar to the characters in "The PJs" that the creators and producers of "The PJs" could not have known, imagined, or thought up these facts independently. For example, Plaintiff asserts the character

6

Sanchez in "The PJs" closely resembles Tally Collier, an individual who appeared in Plaintiff's documentary. Plaintiff asserts that both Tally Collier and the character Sanchez use a voice box to speak, their wives are deceased, they have similar head-neck placement, dark eyebrows, jowled cheeks, similar noses, similar gestures, and similar built. Furthermore, Plaintiff alleges that the creators and producers of "The PJs" used or paraphrased direct verbal remarks stated or implied in his documentary. To illustrate these alleged likenesses, the Plaintiff submitted, as an Exhibit to his Rule 56.1(b)(3)(B) statement, a DVD labeled "Comparison Video." The Comparison Video contains footage from the Plaintiff's video and the footage from "The PJs" that is allegedly similar to the footage in Plaintiff's video. Plaintiff asked the Court to review the Comparison Video, and the Defendants joined in this request.

Considering the depictions on the Comparison Video, and the other evidence presented by the parties, no reasonable jury could find that Plaintiff's video is substantially similar to "The PJs". Plaintiff's videotape consists mainly of a disconnected series of interviews with real people, while "The PJs" is a fictional cartoon with plots related to its fictional characters. The look and feel of the two works are entirely different. Further, what few superficial similarities between Plaintiff's videotape and "The PJs" concern non-protectable elements of Plaintiff's video, not copyrightable depictions. For example, Plaintiff claims that some of the "foamation" characters on "The PJs" look like people in his videotape and that certain of the buildings in the cartoon resemble buildings in his videotape; but Plaintiff cannot own a copyright in someone else's appearance or the way a building looks. It is well-settled that real-life facts and real-life people are not copyrightable, so even if there were some similarities, these features would not give Plaintiff a viable claim. As the court in *Fiest* emphasized, "[F]acts do not owe their origin

7

to an act of authorship. The distinction is one between creation and discovery. The first person to find and report a particular fact has not created the fact; he or she has merely discovered its existence." *Fiest*, 499 U.S. at 347. Taking images and facts from real-life people and places and then recasting those images and facts into a cartoon does not support a claim for copyright infringement. Regardless of how original the Plaintiff claims his documentary is, the facts it exposes are "free for the taking." *Fiest*, 499 U.S. at 349. "The very same facts and ideas may be divorced from the context imposed by the author and restated or reshuffled by second comers, even if the author was the first to discover the facts or to propose the ideas." *Fiest*, 499 U.S. at 349. Therefore, the Defendants were free to use the facts that may also have been recorded in the Plaintiff's documentary video. Although the facts themselves are not copyrightable, the Plaintiff's selection, coordination, and arrangement of those facts are copyrightable. Nonetheless, the Plaintiff admits that his claim of infringement "does not rely on similarities in the sequence of any story." (Resp. in Opposition to Def's Motion for Summary Judgement at 12). The images in Plaintiff's video that he claims were copied by the Defendants are common facts and have not been selected or arranged in a fashion to constitute an original creation by the Plaintiff.

*Access to the Videotape*

Assuming that Plaintiff were able to establish substantial similarity, summary judgment would also be granted because there are not issues of material fact with respect to whether the Defendants had access to the Plaintiff's video tape – an element of copyright infringement. It is well-settled that "the burden of proving access . . . lies squarely on the plaintiff's . . . shoulders." *Mowry v. Viacom Int'l, Inc.*, 2005 U.S. Dist. LEXIS 15189, at *22 (S.D.N.Y. July 29, 2005).

Here, Plaintiff's videotape was never publicly aired; and Plaintiff does not claim that he sent it to any of the Defendants. Instead, Plaintiff claims that he sent the videotape to Oprah Winfrey and asserts that Winfrey may have sent the videotape to one of the Defendants (he does not say to whom or when). But the only evidence on this issue is that Winfrey's company strictly complies with its rule against sharing submissions with people who are not affiliated with the Oprah Winfrey Show. Any employee who forwarded a submission to anyone outside Winfrey's company would be subject to termination. Further, other than Plaintiff's assertion without support (he never produced any copy of the green card during discovery), there is no evidence that the video was sent to Oprah. The Defendants produced evidence that there is no record that Oprah received the videotape allegedly sent by the Plaintiff. Further, access cannot be established circumstantially "by proof of similarity which is so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded." *Selle*, 741 F.2d at 901. Indeed, for the reasons discussed above, the tenor of the works is entirely different; and the commonalities, few and non-specific. The major similarity between the two works is that they are both set in urban housing projects and document life within these types of communities. The similarities are not "so striking" as to circumstantially establish that Defendants had access to the Plaintiff's video. Thus, Plaintiff's claim of Defendants' access is unsupported by facts; and summary judgment is granted in favor of the Defendants.

*Defendants' Prior Creation*

Defendants are also entitled to summary judgment because the evidence is uncontradicted that the concept and characters for "The PJs" were conceived and created before Plaintiff claims

9

to have sent his videotape to Oprah. Although Plaintiff disputes the timing of the creation of "The PJs," a review of the record supports Defendants' claim; Plaintiff offers only his own statement to the contrary. Scripts for "The PJs" describing characters and plots had been drafted by December 1997, and all of the character sketches were drawn and approved by January 1998 – before Plaintiff claims to have sent his videotape to Oprah in mid-April 1998. Thus, on this ground, as well, summary judgment is granted in favor of the Defendants.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment is granted.

Dated: 2-15-07

JOHN W. DARRAH
United States District Court Judge